# TERRITORY OF MONTANA, RESPONDENT, v. DENNIS MANTON, APPELLANT.

PRACTICE, CRIMINAL — *Change of venue.*— The prisoner had been convicted of murdering his wife by neglect, and on appeal to the Supreme Court the judgment was reversed. The facts as charged in the indictment appear in the syllabus of *Territory* v. *Manton,* 7 Mont. 162. At the time of his second trial he made application for a change of venue from Deer Lodge County, basing it on his own verified petition, and the joint affidavit of fourteen citizens of the county, which recited in substance that in his own and the opinion of the other affiants he could not obtain a fair trial in said county, because of the prejudice existing among the inhabitants against him. The trial court took the application under advisement, until a successful attempt had been made to obtain a jury, and then denied the same. *Held,* that the granting or refusal of a change of venue is in the discretion of the trial judge, who, however, must exercise a judicial discretion, not upon the opinions and conclusions of persons, but upon facts satisfactorily proven. (*Kennon* v. *Gilmer,* 5 Mont. 257, cited.) *Held,* the petition and affidavit presented were wholly insufficient for a change of venue, and that even if the trial judge did make his decision dependent upon the test of being able to obtain a jury (although such a practice is not to be approved), his doing so made no difference. *Held, also,* that the question of a change of venue should be determined from the facts shown by a special procedure for that purpose, either by affidavits presented, or the examination of witnesses in open court or at chambers.

SAME — *Continuance — Immaterial evidence.*— An application for a continuance was made upon the affidavit of the prisoner, which recited that one B., who was absent, although he had been subpœnaed to appear, was a material witness for affiant; that G., a witness for the prosecution, had testified at the former trial, among other things, relative to the conduct of the prisoner on the night of the alleged homicide, as follows: "He gathered up all the papers in the house he could get pertaining to their business (his own and that of his wife, with whose murder he was charged), and put them in his pocket;" and that B., in contradiction, would testify that he had seen G. a few days after the death of the prisoner's wife, search the same house for all papers of any value, and burn all that she found; and also that, at the same time, G. and her son had taken certain jewelry belonging to the deceased, and had laid claim to the ownership

of the same, and also to the house itself, and the ground upon which it stood; and that a subsequent search of the house made by B. and another person for papers of any value was fruitless. The trial court ruled that a continuance would be granted, unless the county attorney could admit that the witness B. would swear to the facts as set forth in the affidavit, if he were present in court. The said officer consented, and the motion for a continuance was overruled; the trial proceeded, and the affidavit was read to the jury, the rule of practice laid down in *Territory* v. *Perkins*, 2 Mont. 467, and *Territory* v. *Harding*, 6 Mont. 323, being thereby followed. The appellant asked the Supreme Court to re-examine the ground upon which the said cases were based, and to change the rule they established. *Held*, that the facts offered to be proven by B. in contradiction of G. (although the latter gave the same testimony on the trial that she had given before concerning the papers) were too remote and irrelevant upon which to base a motion for a continuance; that such motion might properly have been refused on that ground, and that, therefore, there was no occasion to re-examine the cases of the *Territory* v. *Perkins and Harding*, aforesaid. *Held, also*, that the court's refusal to examine said cases was not to be considered as affirming them.

CRIMINAL LAW — *Instruction* — *Section* 40, *division* 4, *Compiled Statutes, construed.* Instruction 8, upon the trial of a prisoner for murder, was as follows: "The killing being proved, the burden of proving circumstances of mitigation, or that justify or excuse the homicide, will devolve on the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime comm 'ted only amounts to manslaughter, or that the accused was justified or excused in committing the homicide." Objection was made that the words, "the killing being proved," were applicable only to cases in which no conflict arose as to the manner of death and the instrument used in the killing. *Held*, said instruction being a precise copy of section 40, division 4, Compiled Statutes, that by force of said section it states the law of Montana; and that the words objected to do not refer to the class of cases claimed, but mean that if the jury find the fact of the killing, and that the prisoner did it, then the burden of proof devolves on the accused as defined in the instruction.

SAME — *Instructions* — *Manslaughter.* — Instructions 10 and 11 in a murder trial were as follows: "Manslaughter is the unlawful killing of a human being without malice or any mixture of deliberation. Voluntary manslaughter is the killing of a human being by another person, upon a sudden heat of passion caused by a provocation apparently sufficient to make the passions irresistible in a reasonable man." "Involuntary manslaughter is the killing of a human being by another without any intention to do so, in the performance of an unlawful act, not felonious or which would not naturally tend to destroy human life, or in the performance of a lawful act, without that due care and caution which every reasonable man should exercise in doing any act which might result in the destruction of human life." Instruction 20 was as follows: "Death resulting from the wilful omission of duty is murder. If the jury believe, beyond a reasonable doubt, that Susan E. Manton came to her death by reason of the wilful neglect of Dennis Manton, of his duty towards her, then they should find him guilty of murder, provided they believe that all the other elements necessary to constitute that crime have been proved beyond a reasonable doubt." It was objected that the offense of manslaughter could not be made out under the evidence upon the trial, and that instructions 10 and 11 were therefore improperly given; also, that said instructions were irreconcilable with said instruction 20. *Held*, that the indictment in this case charging murder necessarily embraced manslaughter, and that it would have been error not to have defined manslaughter to the jury; that the offense charged being the wilful failure of the prisoner to prevent his wife's perishing from exposure in

the cold, those portions of the definitions of voluntary and involuntary man-
slaughter in instructions 10 and 11, relating to the "sudden heat of passion,"
the "performance of an unlawful act not felonious," and the performance of a
lawful act, "without due care and caution," were inapplicable, and could be
rejected as surplusage, but that otherwise the said instructions applied. *Held*,
*also*, that while instruction 29 was obscurely drawn as to the portion of it which
admonished the jury "that all the other elements necessary to constitute that
crime must be proved beyond a reasonable doubt," it nevertheless sufficiently
stated the law in connection with instructions 10 and 11, defining manslaughter,
and a previous instruction granted, containing a full explanation of what con-
stituted murder — particularly in view of the fact that the jury found the prisoner
guilty of manslaughter only. (*Parchen* v. *Peck*, 2 Mont. 567, cited.)

SAME — *Instructions* — *Threats.* — An instruction (numbered 21, see statement) in a
murder trial, directed that the jury might take into consideration any previous
quarrels and difficulties between the deceased and the prisoner as evidence of
malice. *Held*, that the instruction was proper. (*Territory* v. *Scott*, 7 Mont.
407, cited.)

SAME — *Instructions* — *Failure to request.* — Instruction 22 (see statement) directed
the jury to consider the drunkenness of the deceased, on the night of her
exposure, in order to shed light on the question of whether she was too violent
to be controlled by the prisoner. It was contended, that the jury should have
been told to consider it in order to determine whether the death was the result
of drunkenness or cold. *Held*, that if the prisoner desired an additional
instruction as to the drunkenness of the deceased, he should have requested it.

SAME — *Instruction.* — *Held*, that instruction 32 (see statement) covered all the facts
charged in the indictment, and was supported by the evidence.

SAME — *Manslaughter* — *Verdict* — *Drunkenness.* — It was objected that the verdict
of the jury in the case at bar, finding the prisoner guilty of manslaughter, was
not sustained by the evidence. The testimony showed that the prisoner and his
wife had gone to a town seven miles distant from their home, and that while
there they both drank together, so as to become more or less intoxicated; that
they walked towards home together on the same day, but before reaching the
house, at a place within easy calling distance, however, the deceased fell down
on the ice, and the prisoner proceeded home without her and left her there all
night, poorly clad, exposed to the cold. The prisoner and his hired man were
in the house that night, and could have rescued the deceased. In the morning
they brought her in-doors, but she remained speechless, no effort being made to
obtain medical aid, and died the next day from the exposure. *Held*, that the
evidence sustained the verdict, and that the drunkenness of the prisoner was no
excuse for his failure to discharge his duty as a husband to his wife.

*Appeal from the District Court, Deer Lodge County.*

STATEMENT.

The defendant, Dennis Manton, was indicted for the murder
of his wife, Susan E. Manton. He left her lying outside of
their house in the snow one winter-night, and death resulted
from the exposure. He was tried in the District Court of
Deer Lodge County, at the April term, in 1887, found guilty
of murder in the second degree, and sentenced to twenty years
in the penitentiary. On appeal to the Supreme Court, the

judgment of the District Court was reversed, for error in an instruction to the jury (*Territory* v. *Manton*, 7 Mont. 162), and a new trial granted him. A new trial in the District Court in the same county, on December 20, 1887, resulted in a conviction of manslaughter, and his being sentenced to ten years in the penitentiary, from which conviction and sentence the present appeal was taken.

Instruction 21 was as follows:—

In determining the question of the act charged in the indictment, the jury may take into consideration any quarrels and disputes between the defendant and the deceased, and any facts as to the difficulties of any kind which have been proved in the case to have existed between them. Prior difficulties between the accused and the deceased are evidence of malice, and may be considered for that purpose.

Instruction 22 was as follows:—

All evidence as to the habits of the deceased as to inebriety was admitted, for the purpose of tending to show that at the time charged in the indictment the deceased was of such a character, and so violent, that the defendant could not control her, or protect her, and if the jury find from the evidence that she was in such condition that the defendant could protect her, then such facts as to her previous violence and disposition prior to the 28th of February, 1887, are not to be considered as a defense.

Instruction 32 was as follows:—

The law in this kind of a case is, that if the defendant at the time charged in the indictment was the husband of the deceased, the law imposed on him the obligation of affording her shelter and protection from the cold, and of caring for and saving her life under all circumstances and conditions, as far as it lay in his power to do; and if at the times charged in the indictment, when she received the injuries therein named, said Susan E. Manton was in such feeble condi'i n, or was from any cause so feeble, or was in such condition not to be able to protect herself, and to reach h .    shelter, and the defendant was her husband, and knew .    aid condition, and also knew from all the facts and circumstances, taking into consideration her condition, the coldness of the night, the extent and char-

acter of her wrappings, and where she lay, and the length of time he left her lying there so exposed, and that leaving her in such condition would endanger her life, and that if he wilfully and purposely so left her, and that her death was caused by such exposure—if all these facts exist, it would be murder; and if you find from the evidence beyond a reasonable doubt, that about the time charged in the said indictment, Susan E. Manton was in such condition as not to be able to protect herself, and that the said Dennis Manton knew such fact, and had the means and ability to protect and keep her from the cold, and that he left her so exposed, as stated in the indictment, and lying out of any house or shelter all night, and was her husband, and had reason to believe that the leaving her to lie out in such condition all night would endanger her life, and that he, said Dennis Manton, so left her, said Susan, in such condition with malice aforethought, either express or implied, and that she died from the effect of such exposure, and that the same occurred in Deer Lodge County, Montana Territory, you will find the defendant guilty of murder.

*Cole & Whitehill*, for Appellant.

The court below refused to grant a change of venue until an attempt had been made to obtain a jury; and a jury having been obtained, denied the application for the same. It is admitted that there are cases in the books that approve this method of discovering that no prejudice exists against a defendant in a criminal case; but we submit that the mere fact that a jury can be obtained, after nearly or quite exhausting the county, does not by any means prove that prejudice does not exist against him in the county where he is to be tried. (Comp. Stats. § 226, p. 445; *Shattuck* v. *Myers*, 13 Ind. 47; 74 Am. Dec. 236, and note.) The admission of the prosecuting officer that the absent witness would swear as set out in the affidavit, ought not to be a ground of refusal of a continuance. We contend that the law as laid down in the *Perkins Case*, 2 Mont. 570, and by the majority of the court in the *Harding Case*, 6 Mont. 323, is bad, not supported by reason or authority, and ought not to be followed. (*Smith* v. *Creason's Ex'rs*, 5 Dana, 298; 30 Am. Dec. 688; *Hyde* v. *State*, 16 Tex. 445; 67

Am. Dec. 630, and note.) Instruction 8. This instruction is wrong, taking into consideration the evidence that was given on the trial. The words, "the killing being proved," refer to cases where there is no conflict of testimony as to the manner of the death, and the instrument used in the killing, and by no possible construction can mean the fact of "death being proven." The jury, by this instruction, were led to believe that as soon as the death was proved, the burden of proving the circumstances of mitigation in justification or excuse devolved upon the defendant. Such is not the law. (Wharton on Homicide, § 669.) Instructions 10 and 11 give the statutory definition of manslaughter. Nothing is manslaughter under the laws of this Territory, except what is made so by statute. Under the evidence in this case, the statutory offense of manslaughter cannot be made out. It certainly is not voluntary manslaughter as defined in instruction 10. Is it involuntary manslaughter as defined in instruction 11? In any view of the evidence was Dennis Manton at any time on the night of the alleged killing "in the performance of an unlawful act, not felonious or which would not naturally tend to destroy human life, or in the performance of a lawful act without that due care and caution which every reasonable man should exercise in doing any act which might result in the destruction of human life." Instructions 10 and 11 cannot be reconciled with instruction 20. Instruction 21 does not state the law, and is misleading. The jury are told in so many words that prior difficulties between the accused and the deceased are evidence of malice, and may be considered for that purpose. This is certainly stating a fact to the jury, and this cannot be done by the court, as the jury are the judges of the facts; besides prior difficulties are not evidence of malice in themselves, but may be given as tending to show malice, at least this is as strong as given in any of the books. (*People* v. *Kern*, 61 Cal. 244; *People* v. *Messersmith*, 61 Cal. 246.) Instruction 22 is not correct. The evidence of the habits of the deceased as to inebriety was admitted, not only to show that the deceased was violent, and could not be controlled or protected while under the influence of liquor, but for the additional purpose of showing that the deceased came to her death by the use of intoxicating liquor. This instruction takes

away from the jury the consideration of the last purpose above mentioned, and is therefore incorrect. Instruction 32 purports to give "the law in this kind of a case." If the facts stated in this instruction constitute murder, then the definition of that crime in the law books is wrong. The verdict is not sustained by the evidence.

*W. E. Cullen,* Attorney-General, for Respondent.

The court held the motion for a change of venue under advisement until after he had ascertained, by impaneling an absolutely impartial jury, that there were at least twelve men in the county who had escaped the all-pervading influence of prejudice. There was no error in this. (*Shattuck* v. *Myers,* 13 Ind. 47; 74 Am. Dec. 236, n., 244, and cases cited.) If the court now felt disposed to reverse or reconsider the rule established in the Perkins and Harding cases, the facts presented by this record do not seem of sufficient importance to warrant it. If there was any error in the matter of this continuance, it was in holding that the testimony which the absent witness would give was material. Instruction 8 was correctly given. (Wharton on Criminal Evidence, § 322; *Leache* v. *State,* 22 Tex. App. 279; *State* v. *Johnson,* 91 Mo. 439.) So also were instructions 10 and 11. As long as the jury did not find malice, it is manifest that the defendant was not prejudiced by instruction 21, whether it states the law correctly or not. (*Parchen* v. *Peck,* 2 Mont. 567.) *Territory* v. *Scott,* 7 Mont. 407, approves of instruction 21; *Territory* v. *Manton,* 7 Mont. 162, decides the objection to instructions 23 and 32.

McCONNELL, C. J. — The prisoner in this case was convicted of manslaughter in the District Court of Deer Lodge County on the twentieth day of December, 1887, and was sentenced to imprisonment in the territorial prison for ten years. There was a motion for a new trial, which was overruled, and an appeal taken to this court. This case was before us at the July term, 1887, and was then reversed and remanded for a new trial, upon the ground of an erroneous instruction inadvertently given. (See 7 Mont. 162.) There are several grounds of error relied upon by appellant for a reversal of this case. (1) Error for not

granting a change of venue. (2) Error for not granting a continuance. (3) Error of law in giving certain instructions to the jury. (4) The evidence does not sustain the verdict.

We will notice these several grounds *seriatim*.

1. The prisoner presented his petition, which was sworn to, supported by the affidavits of a number of the residents of Deer Lodge County, setting forth that the "inhabitants of said county were so prejudiced against him" that he could not expect a fair trial therein. The court took the matter under advisement until an effort was made to obtain a jury. In other words, he made the result of an effort to obtain a jury determine the question whether the prisoner was entitled to a change of venue, and, being satisfied from the disclosures made from such effort that he could have a fair trial in said county, he overruled the motion. This proceeding was had under section 226 of the Criminal Practice Act of the Territory. It provides, among other things, that "any defendant, in any indictment or information, may be awarded a change of venue, upon a petition, etc., . . . . and such judge or court being satisfied that such cause exists, . . . . may award a change of venue." The judge or court may award the change of venue upon the unsupported petition of the prisoner, verified by oath either of himself or some credible person. The whole matter rests in the sound discretion of the trial judge, subject to a reversal for an abuse of that discretion. This discretion is a judicial one, which should only be exercised on good cause shown, which must consist of facts proven to the satisfaction of the judge or court, and not the conclusions and opinions of the parties who make the affidavits. (*Kennon* v. *Gilmer*, 5 Mont. 257.) The prisoner read the joint affidavit of fourteen persons in support of his application for a change of venue. That affidavit, after giving the names of the witnesses, is as follows, to wit: "———, being duly sworn, each for himself says, that he is a resident of Deer Lodge County; that he has heard the case of the Territory of Montana against Dennis Manton frequently discussed by persons living in the neighborhood of where affiant resides, and from what he has heard he does not believe that said Dennis Manton can have a fair and impartial trial in said county, for the reason that the inhabitants of said county are prejudiced against said Manton."

This affidavit does not state a single fact. It simply states the opinions of the witnesses from what they have heard. In the case of *Kennon* v. *Gilmer, supra,* the learned chief justice, who delivered the opinion of the court, says: "An affidavit against a whole community, that states the mere conclusions of the witnesses, is of no consequence whatever. It ought to state the facts, so that the court, and not the witnesses, may determine whether the community is prejudiced. The court is to make a finding from the facts. It is to determine in a judicial manner whether an impartial trial may be had." He sustained this holding by reference to the following cases: *People* v. *Yoakum,* 53 Cal 567; *People* v. *Congleton,* 44 Cal. 95; *People* v. *Shuler,* 28 Cal. 495; *People.* v. *Mahoney,* 18 Cal. 185; and *People* v. *McCauley,* 1 Cal. 383. The fact that the court wanted to see whether a jury could be obtained before it decided the application for a change of venue, and the further fact that it may have decided it upon the ground that a jury could be and was easily obtained, make no difference in this case, because the petition and affidavits were wholly insufficient, and the court ought to have refused the application when it was presented. We remark, however, that we do not think that the fact that a jury may be obtained in a county is at all conclusive that a fair and impartial trial can be had in such county. (See case of *Kennon* v. *Gilmer, supra.*) We do not approve this practice. The court should determine the question from the facts shown, upon a procedure for that special purpose, either by testimony taken by affidavits, or witnesses called and examined in open court, or before the judge at chambers, as the case may be.

2. The application for continuance was made upon the affidavit of the prisoner, stating that one Hiram Bernard was a material witness in his defense, and that he would contradict one Catharine Gannon, a witness for the prosecution; that said witness had testified on the former trial on behalf of the Territory in reference to the prisoner's conduct on the evening and night of the alleged homicide, among other things, as follows, to wit: "He [referring to said defendant] made his biscuits, put his biscuits in the oven, went into the room, and gathered up all the papers he could get, and made a bundle of them, and put them in his pocket." And, in cross-examination, further testi-

fied: "He [referring to the defendant] stayed till eight o'clock, till he put his biscuits in the oven, and went in and ransacked, and got a bundle of papers, and put them in his pockets. They were some papers that they had with their business." Said affidavit alleges that witness Bernard will contradict said witness Gannon in relation to the above evidence as follows, to wit: "That a few days after the death of Susan E. Manton, to wit, on the fourth day of March, 1887, the said Hiram Bernard was the keeper for the sheriff of the county of Deer Lodge, who had levied upon the property of the said Manton, and that said Bernard was in the room in the house where said Susan E. Manton died; that he was in the possession of said house for a period of at least ten days thereafter; that the witness Catharine Gannon, together with her son, was in said house when he took possession of said house as said keeper, and they remained there at least six days after the said Bernard took possession; that during that time the said Catharine Gannon searched all the drawers and places and shelves where papers and books were kept, and the said Bernard saw the said Catharine Gannon burn all the papers, documents, and books that were found in said drawers, bureaus, and other places, which were of any value, and at the same time she took the watch and jewelry that belonged to the deceased, and appropriated and kept them, and claimed with her son the possession and ownership of said house and premises; that afterwards the said Bernard, in company with H. R. Whitehill, one of the attorneys for the defendant, searched for all legal papers belonging either to Dennis Manton, the defendant, or the said Susan E. Manton, and were not able to find any papers of any value whatever, for the reason that the said Catharine Gannon had destroyed all the papers of value that were in the house." The court refused to grant the continuance, but with the consent of the county attorney allowed the affidavit to be read as the deposition of the witness Bernard. A careful analysis of the testimony set forth in the affidavit will show that it is wholly immaterial. The only point upon which he proposed to contradict her was that "he gathered up all the papers he could get, and made a bundle of them, and put them in his pocket. They were some papers that they had with their business." We gather from the evidence in the transcript

that deceased was the owner of the property, and the materiality of this evidence that he put some papers in his pocket lies in the fact that it might shed some light upon a motive on the part of the prisoner to destroy the deceased, who was his wife. And it appears that the witness Gannon testified on the trial substantially as it is stated in the affidavit she did on the former trial. But we are unable to see how the testimony of Bernard could contradict her statement. He says, according to the affidavit, that, some time after the death of the deceased, he, as an officer, was in the custody of the house of the prisoner, and the witness Gannon was there, and he saw her burn "all the papers, documents, and books that were found in said drawers, bureaus, and other places that were of any value." How this contradicts the statement that the prisoner "gathered up all the papers that he could get, made a bundle of them, and put them in his pocket," it is hard to see. It is not stated what papers they were, nor that he got them out of the drawers, nor that the papers which she is alleged to have obtained from the drawers and bureaus, and burned, were the same she testified he gathered up. Both statements may stand together perfectly consistent. Besides, it is not disputed that the prisoner stayed in the house all night after he came back from where the deceased was left; that he was there all the time after his wife was brought to the house, the next day, and until her death, which was some twenty-six hours, and how much longer before he was arrested the proof does not disclose. The fact that Mrs. Gannon may have burned the papers she found does not contradict the statement that some time before he gathered up all he could get pertaining to their business, and put them in his pocket. The testimony is too remote and irrelevant upon which to predicate an application for a continuance. But the court below, following the rule laid down in *Territory* v. *Perkins*, 2 Mont. 467, and *Territory* v. *Harding*, 6 Mont. 323, stated that he would continue the case, unless the county attorney would consent that the affidavit should be read as the deposition of the absent witness, and, the county attorney consenting, the motion was overruled. We are asked to re-examine the ground upon which these cases are based, and put a different construction upon our Criminal Practice Act touching continuances on account of the absence of

a material witness. We do not think this is a proper case in which to consider this question, but by our silence we do not wish to be understood as affirming those decisions. We think the continuance might have been properly disallowed upon the ground already indicated.

3. Objection is made to instruction 8, upon the ground that the words "the killing being proved" refer to cases where there is no conflict of testimony as to the manner of the death and the instrument used in the killing, and that the jury, by this instruction, were led to believe that, as soon as the death was proved, the burden of proving circumstances of mitigation or justification devolved upon the defendant. We are referred to Wharton on Homicide, section 669, in support of this position. In the section referred to the learned author is combatting the doctrine that, " when the mere act of killing is proved without anything more, malice is presumed." "This," he says, "is an axiom handed down to us from the scholastic jurisprudence, and has no application to any case that can arise in a court for trial of real issues; for no such thing as a mere abstract killing of B by A can be proved." In other words, while he does not gainsay the truth of the proposition as an abstract principle of law, yet, in practice, it can never occur, for the reason that in the very circumstances attending the killing there will always be evidence either tending to prove or disprove the existence of malice. But the instruction in question is a precise copy of section 40 of the Criminal Laws of this Territory, and with us it has the sanction of legislative authority, and by force of the statute is the law. We do not agree with the counsel for the prisoner as to the kind of case to which the words quoted above refer. The language is, "the killing being proved," not admitted. It means that if the jury find the fact of the killing, and that the prisoner did it, then the burden of proving circumstances which mitigate the offense from murder to manslaughter, or justify the killing altogether, will devolve on the accused, unless the very evidence itself which proves the killing, and that it was done by the prisoner, also shows that it was manslaughter, or justifiable homicide. There was, then, no error in this instruction. Instructions 10 and 11 are also objected to. They define manslaughter, voluntary and involuntary, in the language of the

statute; and in a trial upon an indictment charging murder, which necessarily embraces manslaughter, it would be error to fail to give the jury instructions as to what constitutes manslaughter. And we will see further on that this instruction was proper under the facts of the case. The objection to instruction 20 is that it cannot be reconciled with instructions 10 and 11, defining manslaughter. When this case was before us a year ago, we defined the nature and character of the offense charged in the indictment. (See case of *Territory* v. *Manton,* 7 Mont. 162.) And we repeat here again, quoting from 2 Bishop on Criminal Law, section 689, that "the doctrine on this subject is that wherever there is a legal duty, and death comes by reason of any omission to discharge it, the party omitting it is guilty of a felonious homicide." And it is immaterial "whether the action be of the mind or of the body; whether it operates solely or concurrently with other things; whether it was consented to by the person on whom it operated or not; whether it was an unlawful confinement, or the leaving a dependent person in a place of exposure, or any omission of duty which the law enjoins." The very volition of the defendant which led him to refuse aid to his wife, when the law imposed the duty upon him to protect her, is transferred to the violence of the elements, and he is made to use their forces, and hence is responsible for the death which they immediately caused. It is well to bear in mind that in this case it is an undisputed fact that the deceased was the wife of the prisoner; and it must be further borne in mind that the very essence of the charge in the indictment is his failure to do something to save his wife from perishing in the cold. The cold is charged to be the means of her death. The prisoner had it in his power to prevent it, and he wickedly and wilfully stood by and let her die. The gist of the offense charged is his passive inactivity when duty called upon him to protect his wife. Hence those portions of the definitions of voluntary and involuntary manslaughter, which relate to the "sudden heat of passion," and the "performance of an unlawful act, not felonious," and the performance of a lawful act "without due care and caution," are inapplicable, and may be rejected as surplusage. But the instruction defining manslaughter as the "unlawful killing of a human being without malice or any

mixture of deliberation" was directly applicable to the facts of the case. In the case of death caused by criminal negligence it is difficult to draw the line of distinction between murder and manslaughter. Mr. Bishop, in discussing this subject, says: "If the act is one of negligence not clearly showing danger to life, yet, if death follows, the offense is only manslaughter; whereas, if the exposure or neglect is of a dangerous kind, it is murder. Ordinarily, if a husband should withhold necessaries from his wife, and she dies, it will be only manslaughter, since this act is not so immediately dangerous to life as the other. Whether death caused by neglect is murder or manslaughter is made to depend on the nature and character of the neglect." While instruction 20 makes the wilful omission of duty, which results in death, the test as to whether it is murder, yet the same instruction admonishes the jury that they must believe that all the other elements necessary to constitute murder must be proved beyond a reasonable doubt. In a previous instruction a full explanation of what it took to constitute murder had been given to the jury. While, then, this proposition is obscurely drawn, and the full statutory definition of manslaughter is given, we do not think there is any inconsistency between them, when we take such parts of the latter definition as are applicable to the case; and we feel the better satisfied with this conclusion, in view of the fact that the jury acquitted the prisoner of murder, and only found him guilty of manslaughter. (*Parchen* v. *Peck*, 2 Mont. 573.) Instruction 21 is objected to on the ground that it states a fact to the jury, and thereby invaded the province of the jury. It stated to the jury that they might take into consideration any previous difficulties and quarrels between the deceased and the prisoner as evidence of malice. In the case of *Territory* v. *Scott*, 7 Mont. 407, we sustained a similar instruction, and we refer to that case for the reasons of our decision. Instruction 22 is objected to on the ground that it directs the jury to consider the drunkenness of the deceased on the night of her exposure, to shed light upon the question as to whether she was of so violent a disposition on that occasion that the prisoner could not control her, and was thereby excused for letting her lie out all night, when it is contended that the jury should have been told to consider it to determine whether deceased

came to her death by drunkenness or by exposure to the cold. A sufficient answer to this objection is that the able counsel who represented the prisoner on the trial did not ask any such additional instruction of the court. Certainly the evidence is too slight upon which to predicate such an instruction to induce us to reverse this case upon that ground, when the counsel did not attach importance enough to it to ask it below. (Thompson's Charging the Jury, §§ 81, 127, and authorities there cited.) The counsel for the prisoner observes as to instruction 32 that if "the facts stated in this instruction constitute murder, then the definition of that crime in the law books is wrong." This instruction is made to cover all the facts charged in the indictment, and covered by the evidence, and we think is correct in every particular; and the objection of counsel is a restatement in brief of the ground of his demurrer to the indictment, which we disposed of when this case was before us the other time.

4. The last objection made by the counsel for the prisoner is that the evidence does not sustain the verdict. Without entering into a review of it, it is sufficient to say that we think it abundantly sustains it. The prisoner allowed his wife to lie out on the ice, poorly clad, and within easy calling distance of the house, all night, and perish with the cold. He had a hired man living with him, who was willing to help him, and they could have brought her to the house, notwithstanding the snow was from two to three feet deep. The best evidence of this is that they did do it the next morning, when it was too late. She languished speechless until the next day, and died. No effort was made to get her medical aid. It is true, the deceased had been drinking, and that this was probably the reason she was not able to reach the house herself; but the proof shows that they had gone together to Philipsburg that day, a distance of seven miles, on foot, and that they both drank together, and the prisoner was himself more or less intoxicated when he left her on the ice to spend the night, while he remained in the house near by. His drunkenness does not excuse him from the discharge of his duty to his wife as a husband; nor does her drunkenness excuse him from the discharge of his duty, especially when he drinks with her, and by example and precept contrib-

utes to her degradation. The prisoner has had two trials, and the present verdict, which finds him guilty of manslaughter, must stand. Let the case be affirmed.

*Judgment affirmed.*

BACH, J., and LIDDELL, J., concur.